# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-01807-COA

| | |
|---|---|
| **DAVID MCKEAN, FRANCESCO MEDINA, DONALD ARRINGTON AND WAYNE ROBERTSON** | **APPELLANTS/CROSS-APPELLEES** |
| **v.** | |
| **YATES ENGINEERING CORPORATION, ANDERSON REGIONAL MEDICAL CENTER, AND FOIL WYATT ARCHITECTS AND PLANNERS, PLLC** | **APPELLEES/CROSS-APPELLANTS** |

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2013 |
| TRIAL JUDGE: | HON. LESTER F. WILLIAMSON JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | MARK D. MORRISON |
| | KEN R. ADCOCK |
| | WILLIAM CHRISTOPHER IVISON |
| | EUGENE COURSEY TULLOS |
| ATTORNEYS FOR APPELLEES: | JAMES D. HOLLAND |
| | ROMNEY HASTINGS ENTREKIN |
| | ROBERT B. IRELAND III |
| | THURMAN LAVELLE BOYKIN III |
| | RICHARD O. BURSON |
| | PEELER GRAYSON LACEY JR. |
| | SHIRLEY M. MOORE |
| NATURE OF THE CASE: | CIVIL – PERSONAL INJURY |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEES' MOTIONS FOR SUMMARY JUDGMENT |
| DISPOSITION: | AFFIRMED – 09/01/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

BARNES, J., FOR THE COURT:

## FACTS AND PROCEDURAL HISTORY

¶1.    This case stems from an accident that occurred during the construction of Anderson Regional Medical Center's "Medical Towers III" expansion in Meridian, Mississippi. ARMC entered an agreement with Foil Wyatt Architects and Planners PLLC for the project's design.  Architect E. Bowden "Skip" Wyatt prepared the design drawings for Foil Wyatt.

¶2.    The Medical Towers III construction began in 2008.  Although there was no written agreement, Yates Construction was hired as the general contractor.  Yates Construction then hired Spectrum II as the subcontractor for concrete services.  Plaintiffs, David McKean, Francesco Medina, Donald Arrington, and Wayne Robertson, all worked for Spectrum II.

¶3.    As of September 2008, the first-story reinforced concrete slab had been poured, and Yates Construction was preparing to pour the concrete walls and columns that would help support the elevated second-story reinforced concrete slab.  Yates Engineering[1] became involved in the construction project when Dan Perry, Yates Construction's general superintendent, asked engineer Ted Pope to prepare design drawings of the scaffolding and second-story formwork.[2]

¶4.    During late September 2008, Pope visited the construction site and met with Mike Clark, a construction supervisor for Yates Construction.  Pope noticed some formwork for the first-story concrete columns and walls, but he did not see any scaffolding for the second-story formwork.

¶5.    During Pope's visit, he and Clark discussed some of the necessary features of the

_____

[1]  Yates Engineering was described as a "sister company" of Yates Construction.

[2]  The formwork essentially serves as a mold for the reinforced concrete while it dries. The scaffolding acts as a temporary support for the formwork and the wet concrete.

scaffolding, such as the need for wooden 4"x4" posts and stringers, and 2"x4" joists. Pope prepared his preliminary design drawings, and submitted them for comments to Yates Construction on October 3, 2008. Meanwhile, Yates Construction had begun building the scaffolding before receiving Pope's design drawings.

¶6. It is undisputed that Pope's plan was fundamentally flawed in one significant way – it contemplated using twenty-four-foot posts. However, wooden 4"x4" posts are not available in that length. Consequently, the posts would have to be "tiered" by stacking them end to end and "spliced" for stability. Despite the fact that Pope's plan was effectively impossible to follow, Yates Construction had no comments about Pope's design. Yates Construction asked Pope to send a final version of his design drawings. Pope complied on October 6, 2014. However, Yates Construction ignored essential features of Pope's scaffolding design.

¶7. On November 17, 2008, Spectrum II was pumping wet concrete into the second-story formwork when the scaffolding collapsed. It is undisputed that the collapse was caused by the scaffolding rather than the formwork. The plaintiffs were injured when they fell to the ground.

¶8. On September 1, 2010, the plaintiffs sued Yates Construction. The plaintiffs claimed that Yates Construction negligently failed to build the scaffolding "in conformity with the plans and specifications set forth in the governing construction contract or otherwise in a safe and workmanlike manner."

¶9. Yates Construction responded by filing a motion to dismiss the complaint and an

3

answer. In the motion to dismiss, Yates Construction argued that because it had "effectively secured workers' compensation insurance coverage for the Plaintiffs, [it was] protected by the exclusive remedy provision(s) of the Mississippi Workers Compensation Act." Alternatively, it argued that "as the general contractor, [it was] protected by the exclusive remedy provision(s) on account of the fact that the Plaintiffs, employees of a subcontractor, were provided workers' compensation benefits for their alleged injuries." Therefore, Yates Construction concluded that it was "statutorily immune from the suit brought by the Plaintiffs."

¶10. In February 2011, the plaintiffs amended their complaint and added Yates Engineering and Foil Wyatt as defendants. According to the amended complaint, Yates Engineering and Foil Wyatt negligently failed "to design and formulate plans and specifications for the scaffolding . . . ." The plaintiffs also claimed that Yates Engineering and Foil Wyatt "were negligent in inspecting the scaffold[ing] and failed and/or refused to correct known deficiencies and defects in the construction [that] made it dangerous to use prior to the subject incident."

¶11. In March 2012, the United States District Court for the Southern District of Mississippi ruled on a declaratory-judgment action that had been filed by American Resources Insurance Company Inc. The district court held that Yates Construction was the statutory employer of Spectrum II, and it was therefore immune from suit under tort theories. The circuit court subsequently dismissed the plaintiffs' suit against Yates Construction.

¶12. In June 2012, the plaintiffs again amended their complaint by adding ARMC as a

4

defendant. The plaintiffs claimed that ARMC negligently failed to require a written contract with Yates Construction. Additionally, the plaintiffs claimed that ARMC negligently failed to supervise and inspect Yates Construction's work. Finally, the plaintiffs claimed that ARMC failed to maintain the premises in a reasonably safe condition and warn them of dangers.

¶13. On August 3, 2012, the plaintiffs designated engineer Ralph Sinno, Ph.D., as an expert. Dr. Sinno opined that defects in the scaffolding caused the collapse. Dr. Sinno did not attribute the collapse to any aspect of the formwork. Instead, Dr. Sinno stated that the formwork conformed to Foil Wyatt's specifications.

¶14. Foil Wyatt's motion for summary judgment had been pending since March 2012. At the plaintiffs request, Dr. Sinno submitted an affidavit opining that Foil Wyatt had a duty to inspect and supervise the construction of the scaffolding. However, Foil Wyatt successfully moved to exclude Dr. Sinno's affidavit on the basis that, as an engineer, he was not qualified to opine as to the duties of an architect. The plaintiffs have not appealed the circuit court's decision to exclude Dr. Sinno's affidavit. On November 27, 2012, the circuit court found that Foil Wyatt did not have a duty to inspect the scaffolding. Consequently, the circuit court granted Foil Wyatt's motion for summary judgment.

¶15. On January 14, 2013, Yates Engineering filed a motion for summary judgment regarding plaintiff medina. ARMC joined Yates Engineering's motion. The circuit court granted the motion and held that as an alleged illegal immigrant, Francesco Medina was not

5

entitled to recover even if Yates Engineering and ARMC were found to be negligent.[3]

¶16.   In August 2013, the circuit court granted summary judgment in favor of Yates Engineering.  The circuit court's decision was based on its conclusion that "[a]t no point in time did Yates Engineering assume the duty [to] inspect or supervise the construction and implementation of its design drawings either by contract or conduct."  The circuit court later granted ARMC's motion for summary judgment.  According to the circuit court, "no genuine issue of material fact remains with respect to Plaintiffs' claims against [ARMC], and therefore, [ARMC] is entitled to summary judgment on Plaintiffs' claims against it."  The circuit court also entered a final judgment on that date.

¶17.   The plaintiffs appeal.  They argue that the circuit court erred when it granted summary judgment in favor of Yates Engineering, Foil Wyatt, and ARMC.  Yates Construction and ARMC have filed cross-appeals that need only be addressed if this Court reverses the circuit court's grant of summary judgment in their favor.

## STANDARD OF REVIEW

¶18.   An appellate court reviews a trial court's decision to grant a motion for summary judgment de novo.  *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013).

---

[3]  Specifically, the circuit court held:

> Medina, invoking the Fifth Amendment, has repeatedly declined to verify his citizenship or his immigrant/work status during his deposition testimony. Therefore, the Court can only surmise that Medina is an illegal immigrant. The very injuries for which the plaintiff seeks recovery arose during the course of his illegal employment.  But for his illegal employment, Medina would not have been injured during the construction accident.  In this Court's opinion, to allow Medina to recover for injuries sustained during the course of his own illegal conduct would be contrary to public policy.

"[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then summary judgment "shall be rendered." M.R.C.P. 56(c). The evidence must be viewed "in the light most favorable to the party against whom the motion has been made." *Karpinsky*, 109 So. 3d at 88 (¶9).

## ANALYSIS

### I. Yates Engineering

¶19. According to the plaintiffs, there is a genuine issue of material fact regarding whether Pope breached his duty to design a scaffolding system that would support the formwork and the wet concrete. The plaintiffs also claim that there is a genuine issue of material fact regarding whether Pope breached his duty to inspect the scaffolding that Yates Construction built before Spectrum II poured the concrete. "To prevail in any type of negligence action, a plaintiff must first prove the existence of a duty." *Enter. Leasing Co. S. Cent. Inc. v. Bardin*, 8 So. 3d 866, 868 (¶7) (Miss. 2009). "[W]hether a duty exists in a negligence case is a question of law to be determined by the court." *Id*. An appellate court reviews questions of law de novo. *Facilities Inc. v. Rogers-Usry Chevrolet Inc.*, 908 So. 2d 107, 110 (¶5) (Miss. 2005).

#### A. Duty of Professionalism

¶20. "Mississippi law imposes on design professionals, including architects and engineers, the duty to exercise ordinary professional skill and diligence." *Hobson v. Waggoner Eng'g Inc.*, 878 So. 2d 68, 77 (¶35) (Miss. Ct. App. 2003). Perry admitted that Yates Construction

7

began building the scaffolding before it received Pope's design drawings. It is unclear how much of the scaffolding had been built when Yates Construction received Pope's design drawings. In any event, Pope's scaffolding design was fundamentally flawed because it contemplated using 4"x4" posts that were twenty-four feet tall. Yates Construction could not possibly comply with Pope's design, because 4"x4" posts are not available at that length. Consequently, the posts would have to be "tiered" by stacking them end to end and "spliced" for stability. Because Pope's design did not contemplate using "tiered" posts, his plans did not include the design features necessary to "splice" the posts.

¶21. Pope submitted his design drawings to Yates Construction for review and an opportunity to comment. Despite the fact that Pope's design drawings were effectively impossible to follow, Yates Construction made no comment about Pope's design. Instead, Yates Construction asked Pope to send final versions of his design drawings. Pope complied on October 6, 2014. There is no evidence that the design reflected in the initial drawings was any different than the design reflected in the final versions. Instead of seeking clarification or revision from Pope, Yates Construction acted on its own and "spliced" the posts by fastening a three-quarter-inch strip of plywood on opposite sides of the stacked posts above and below the point where the two posts met. The plaintiffs' expert engineer, Dr. Sinno, reported that Yates Construction's splicing method was "an invitation to catastrophic splicing failure of the entire framing of the scaffolding."

¶22. Yates Construction also ignored Pope's bracing specifications. Instead of using 2"x4" diagonal and horizontal bracings as contemplated in Pope's plan, Yates Construction used

8

1"x4" bracings. According to Dr. Sinno, "[t]he lack of adequate diagonal and continuous cross-bracings from top to bottom of the scaffolding resulted in the instability of the entire framing causing the formwork to collapse." Noting that "[t]he details of the as-built scaffolding on the site are far from th[o]se in the design drawings," Dr. Sinno opined that "the cause of the failure did lie in the as-built scaffolding *and not in the design on paper that was not used*." (Emphasis added).

¶23. Even if Pope's design was inadequate in one aspect, the fact remains that there is no evidence that Yates Construction actually used his design. Instead of seeking clarification regarding the fact that Pope's design called for twenty-four-foot posts that could not actually be obtained, Yates Construction used its own design to "splice" the posts. And Yates Construction ignored the fact that Pope's design called for 2"x4" diagonal and lateral bracings. Yates Construction simply decided to use 1"x4" bracings instead. The plaintiffs' expert reported that the failure was caused by the "as-built scaffolding and not in the design on paper that was not used." Stated differently, there is no evidence that Pope's design caused the plaintiffs' injuries. Without any evidence, there can be no genuine issue of material fact regarding causation. It follows that summary judgment is appropriate regarding the plaintiffs' negligent-design claim against Pope and Yates Engineering.

### B. Duty to Inspect

¶24. According to the plaintiffs, Pope negligently failed to inspect the scaffolding before Spectrum II poured the concrete. Dr. Sinno's report states that Pope "failed to inspect the

9

formwork before casting of the concrete."[4] However, during his deposition, Dr. Sinno was asked whether Pope had a duty to preapprove the scaffolding and formwork before the concrete was poured. Dr. Sinno responded, "No, he's the designer of the scaffolding."

¶25. The plaintiffs cite no authority to support the conclusion that Pope had an absolute duty to inspect the scaffolding and formwork to ensure that Yates Construction followed his design. "Only in limited circumstances will [an engineer], independently of express contract language, have a duty to supervise the construction site to ensure safe operations." *Family Dollar Stores of Miss. Inc. v. Montgomery*, 946 So. 2d 426, 430 (¶12) (Miss. Ct. App. 2006). "Unless [an engineer] has undertaken by conduct or contract to supervise a construction project, he is under no duty to notify or warn workers or employees of the contractor or subcontractor of hazardous conditions on the construction site." *Id*. (quoting *Jones v. James Reeves Contractors*, 701 So. 2d 774, 786 (Miss. 1997)). It is undisputed that there was no written agreement between Yates Engineering and Yates Construction that required Pope to inspect the formwork or scaffolding.

¶26. There are "seven factors to determine whether supervisory powers go beyond the provisions of [a] contract." *Hobson*, 878 So. 2d at 72 (¶15) (citations omitted). Those factors are:

> (1) actual supervision and control of the work; (2) retention of the right to supervise and control; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) assumption of responsibilities for safety practices; (6) authority to issue change

---

[4] Wyatt said that he and Perry inspected the formwork to ensure that wet concrete would not leak out of it. Wyatt added that he did not know whether the scaffolding was finished at that time, and he did not inspect it.

10

orders; and (7) the right to stop the work.

*Id*. On appeal, the plaintiffs argue that Pope inspected the "already existent beginnings of the very structure that he was commissioned to design." But a careful examination of Pope's deposition testimony reflects that the scaffolding and formwork that existed when he visited the site related to the concrete columns and walls that would later help support the second floor – not the actual second floor, itself. Stated differently, the formwork and scaffolding that was in place during Pope's visit was not the scaffolding and formwork that he was commissioned to design. Pope did not know that after his visit to the site, Yates Construction began building the scaffolding and formwork before it received his design drawings.

¶27. Pope unequivocally said that he did not visit the construction site to determine whether Yates Construction followed his design. According to Pope, after his initial visit to the site, he next visited it *after the formwork collapsed*. On an OSHA form, Perry indicated that "the erected form work [had been] inspected by a qualified engineer" approximately one week before Spectrum II poured the concrete. Perry also indicated that he had accompanied the unspecified engineer during the inspection. During his deposition, Perry said he "thought . . . Ted Pope" had inspected the scaffolding and formwork because he "saw him out there one day." When asked whether Pope had been "walking around looking at the [scaffolding,]" Perry responded that he "saw him at the office[, w]hich is a block away." However, when pressed further on the subject, Perry admitted: "[W]e didn't have . . . an engineer look at it." Said differently, Perry conceded that his original answer on the OSHA form was not accurate.

11

¶28. There is no evidence that Pope was involved in the "actual supervision and control of the work." He did not retain any "right to supervise and control" it, and he did not supervise or coordinate any of the subcontractors. Nor did he assume any responsibility for safety practices at the construction site. There was no evidence that he had any authority to issue orders or stop work at the site. As for whether there was evidence of Pope's "constant participation in ongoing activities at the construction site," in the light most favorable to the plaintiffs, Perry conceded that on an OSHA form, he incorrectly stated that he had once seen Pope approximately one block away from the site. Perry also conceded that Yates Construction did not have an engineer inspect the scaffolding before Spectrum II poured the concrete. The evidence does not support the conclusion that Pope had a duty to inspect the scaffolding. There is no merit to the plaintiffs' claim that summary judgment in favor of Yates Engineering was inappropriate.

## II.    ARMC

¶29. The plaintiffs claim that the circuit court erred when it granted ARMC's motion for summary judgment. According to the plaintiffs, there is a genuine issue of material fact regarding whether ARMC breached its duty as the owner of the property to provide them with a reasonably safe working environment. The plaintiffs also claim that ARMC is vicariously liable for Yates Construction's behavior based on an agency relationship between ARMC and Yates Construction.

¶30. Mississippi Code Annotated section 11-1-66 (Rev. 2004) provides that "[n]o owner . . . of property shall be liable for the . . . injury of an independent . . . contractor's employees

12

resulting from dangers of which the contractor knew or reasonably should have known." Additionally, "Mississippi common law protects business owners from injuries sustained by independent contractors on the work site." *McSwain v. Sys. Energy Res. Inc.*, 97 So. 3d 102, 108 (¶18) (Miss. Ct. App. 2012). In the context of a construction project, a property owner has a duty to surrender a reasonably safe working environment to a contractor. *Saranthus v. Health Mgmt. Assocs. Inc.*, 56 So. 3d 1274, 1276 (¶10) (Miss. Ct. App. 2011). That duty contemplates warning a contractor about any hidden dangers on the property that existed before the work began. *Bevis v. Linkous Constr. Co.*, 856 So. 2d 535, 539 (¶9) (Miss. Ct. App. 2003). The plaintiffs do not claim that ARMC negligently failed to warn them about a hidden danger on the property.

¶31.    After the property owner surrenders the property to the contractor, the contractor assumes a "duty to warn or otherwise protect" his employees and agents on the property. *Id*. The contractor's duty to warn others also applies to his subcontractors and their employees. *Id*. However, the Mississippi Supreme Court has stated that the outcome may be different "[i]f [a plaintiff] can show that . . . the owner maintained substantial de facto control over those features of the work out of which the injury arose . . . ." *Magee v. Trans. Gas Pipe Line Corp.*, 551 So. 2d 182, 186 (Miss. 1989). "What is critical is whether the project owner maintains any right of control over the performance of that aspect of the work that has given rise to the injury." *Id*. Stated differently, when a property owner contracts its responsibility for the site to a general contractor, and there is no evidence that the property owner maintained any control over an instrumentality that injured a subcontractor's employee, the

13

property owner is not liable for the employee's injuries. *Avent v. Miss. Power & Light Co.*, 94 So. 3d 1199, 1205 (¶24) (Miss. Ct. App. 2011).

¶32. There is no evidence that ARMC maintained any right to control the design or construction of the scaffolding that collapsed. Instead, the plaintiffs claim that ARMC maintained control of the property in general both directly and through its alleged agency status through Yates Construction. The plaintiffs note that there was no written agreement between ARMC and Yates Construction. However, it is undisputed that ARMC employees were not even allowed on the construction site without first obtaining Yates Construction's permission. During his deposition, Denton Farr, ARMC's vice president of operations, said that he was not allowed on the construction site without first obtaining Yates Construction's permission. He further explained that when he was allowed on the construction site, he "was always accompanied by somebody from Yates." His visits to the construction site were "not consistent and . . . not often." Farr stated that no one employed by ARMC inspected the construction site for safety purposes because ARMC did not "have anybody in that role" and "nobody at [ARMC] ha[d] that expertise." The plaintiffs further note that Denton Farr, ARMC's vice president of operations, attended regular project meetings. During his deposition, Farr explained that ARMC simply wanted to be informed of the construction progress. "The fact that [the property owner] had employees [who] conducted periodic inspections on the work could change nothing" about the fact that the property owner had surrendered control of the premises to a contractor. *Magee*, 551 So. 2d at 185-86.

¶33. Finally, the plaintiffs' derivative claim against ARMC also fails as a matter of law.

14

Assuming for the sake of discussion that Yates Construction was ARMC's agent, Yates Construction was found to be the plaintiffs' statutory employer for the purpose of workers' compensation benefits. The plaintiffs do not challenge Yates Construction's status as their statutory employer. In other words, the plaintiffs have successfully obtained their exclusive remedy against Yates Construction. "[B]ecause vicarious liability derives solely from the principal's legal relation to the wrongdoer, settlement with the tortfeasor removes the basis for any additional recovery from the principal upon the same acts of negligence." *J & J Timber Co. v. Broome*, 932 So. 2d 1, 6 (¶20) (Miss. 2006) (quoting *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 798 (Iowa 1994)). So even if we found merit to the plaintiffs' agency claim, they would have no basis to recover additional damages against ARMC.

¶34. As a matter of law, ARMC did not have a duty to warn the plaintiffs about the condition of the scaffolding that Yates Construction designed and built. The scaffolding did not exist at the time that ARMC surrendered control of the property to Yates Construction, and ARMC had no control over any aspect of the scaffolding. And even if we found that Yates Construction was ARMC's agent, having resolved their claims against Yates Construction, the plaintiffs would not be able to recover further from ARMC. This issue has no merit.

### III. Foil Wyatt

¶35. Finally, the plaintiffs argue that the circuit court erred when it granted Foil Wyatt's motion for summary judgment. According to the plaintiffs, Foil Wyatt had a contractual duty to inspect the formwork and scaffolding before Spectrum II poured the concrete for the

second-story slab. The plaintiffs also claim that Foil Wyatt's conduct created a duty "to ensure the integrity of the concrete formwork." The plaintiffs conclude that there was a genuine issue of material fact regarding whether Foil Wyatt "breached its contractual and professional duties in the premises." "Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact[-]finder." *Facilities Inc.*, 908 So. 2d at 110 (¶5).

### A.   Contract Liability

¶36.   In 1992, ARMC and Foil Wyatt signed an "AIA-B141 Owner/Architect Agreement" (the B141 Agreement), which states:

> [Foil Wyatt] shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences[,] or procedures, or safety precautions and programs in connection with the work, since these are solely the Contractor's responsibility . . . . [Foil Wyatt] shall not have control over or charge of acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work.

"The primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties." *Id*. at (¶6). "In contract construction cases, [an appellate court's] focus is upon the objective fact – the language of the contract. We are concerned with what the contracting parties have said to each other, not some secret thought of one not communicated to the other." *Id.* at 110-11 (¶6).

¶37.   The unambiguous language of the B141 Agreement states that Foil Wyatt is not responsible for construction methods or safety precautions "in connection with the work." The temporary scaffolding at issue was intended to support the formwork while the wet

16

concrete within it hardened.  Stated differently, the scaffolding was a means to build the project's second-story floor.  Therefore, Foil Wyatt is not contractually responsible for ensuring that the scaffolding design was adequate to support the formwork, the steel concrete reinforcement, and the wet concrete while it hardened.  Nor was Foil Wyatt contractually obligated regarding any necessary safety precautions related to the scaffolding.

¶38.  Furthermore, Foil Wyatt had no contractual duty to inspect the scaffolding before Spectrum II poured the concrete.  The B141 Agreement states that Foil Wyatt "shall visit the site at intervals appropriate . . . to determine . . . that the Work when completed will be in accordance with the Contract Documents."  The "Contract Documents" are defined as Foil Wyatt's "Drawings and Specifications setting forth in detail the requirement for the construction of the Project."  The "Contract Documents" do not include any drawings or specifications related to the scaffolding.  They merely state that "adequate bracing and forming is required" and "[c]oncrete construction tolerances shall conf[o]rm to ACI Standard 347 Chapter 203-1, 'Tolerances for Reinforced Concrete Buildings.'"  Because the Contract Documents do not address the scaffolding, Foil Wyatt was not obligated to inspect the scaffolding to ensure that it was in compliance.

### B.    *Liability Through Conduct*

¶39.  As stated above, Foil Wyatt had a common-law duty "to exercise ordinary professional skill and diligence."  *Hobson*, 878 So. 2d at 77 (¶35).  There are limited circumstances in which an architect has an extra-contractual "duty to supervise the construction site to ensure safe operations."  *Montgomery*, 946 So. 2d at 430 (¶12).  "Unless

17

[an architect] has undertaken by conduct or contract to supervise a construction project, he is under no duty to notify or warn workers or employees of the contractor or subcontractor of hazardous conditions on the construction site." *Id*. (quoting *Jones*, 701 So. 2d at 786). There are "seven factors to determine whether supervisory powers go beyond the provisions of [a] contract." *Hobson*, 878 So. 2d at 72 (¶15) (citations omitted). Those factors are:

> (1) actual supervision and control of the work; (2) retention of the right to supervise and control; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) assumption of responsibilities for safety practices; (6) authority to issue change orders; and (7) the right to stop the work.

*Id*.

¶40. Wyatt visited the construction site on a weekly basis, but there was no evidence that he actually supervised or controlled the construction of the scaffolding. During his weekly visits, he usually walked around the site to see how much work had been completed so he could certify payments to Yates Construction. Because the finished concrete was Foil Wyatt's responsibility, Wyatt inspected the rebar and the formwork before Spectrum II poured the concrete. However, he did not review Pope's scaffolding design drawings, and he did not inspect the scaffolding that Yates Construction built. And although Foil Wyatt had the general authority to *reject* work that did not conform to the Contract Documents, it had no authority to *stop* the work. Only ARMC had the authority to stop work on the project.

¶41. There is no evidence that Foil Wyatt undertook to supervise any aspect of the scaffolding. Therefore, Foil Wyatt had no duty to warn the plaintiffs that the scaffolding that Yates Construction built was inadequate. It follows that the plaintiffs' claim against Foil

18

Wyatt fails as a matter of law. We find no merit to this issue.

## CONCLUSION

¶42. It is undisputed that the scaffolding collapsed because Yates Construction did not build it properly. The plaintiffs' expert unequivocally stated that the collapse was not related to Pope's design, because Yates Construction did not follow Pope's specifications. Neither Yates Engineering, Foil Wyatt, nor ARMC had a duty to inspect the scaffolding that Yates Construction built. The circuit court did not err when it granted summary judgment in favor of Yates Engineering, Foil Wyatt, or ARMC. Because these conclusions are dispositive, Medina's claim that the circuit court erred in dismissing his claim due to his immigration status is moot; this opinion should not be construed as implicit agreement with the circuit court's ruling in this regard. The cross-appeals are also moot. We therefore affirm the circuit court's judgment.

¶43. **THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, MAXWELL, FAIR AND WILSON, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**JAMES, J., DISSENTING:**

¶44. I respectfully dissent from the majority's opinion and would reverse the circuit court's grant of summary judgment in favor of Yates Engineering, ARMC, and Foil Wyatt. Although the majority did not reach the issue, I would also reverse the circuit court's grant of summary judgment against Medina. As for the issues raised on cross-appeal that the

19

majority did not reach, I would affirm the circuit court's denial of ARMC's motion to dismiss based on the statute of limitations, and I would affirm the circuit court's denial of Yates Engineering's motion to dismiss Robertson's claim based on judicial estoppel.

### I.    Yates Engineering

¶45.    Genuine issues of material fact exist, which precludes the grant of summary judgment. During construction of the towers, Yates Construction, the general contractor, verbally requested its sister company, Yates Engineering, to draw plans and specifications for the scaffolding used to support the second-floor concrete slab during construction. However, consistent with the prior practices between these separate entities, no written contract was entered into by the parties governing the scope of Yates Engineering's duties. Likewise, no contract existed between Yates Engineering and ARMC. Therefore, the issue before the circuit court was whether Yates Engineering assumed a duty to inspect or supervise the construction of the scaffolding by its conduct.

¶46.    "Engineers and architects are held to a duty to 'exercise ordinary professional skill and diligence,' duties usually controlled by the contracts between the parties." *Family Dollar Stores of Miss. Inc. v. Montgomery*, 946 So. 2d 426, 430 (¶12) (Miss. Ct. App. 2006) (quoting *Hobson v. Waggoner Eng'g Inc.*, 878 So. 2d 68, 77 (¶35) (Miss. Ct. App. 2003)). "Unless the architect has undertaken by conduct or contract to supervise a construction project, he is under no duty to notify or warn workers or employees of the contractor or subcontractor of hazardous conditions on the construction site." *Jones v. James Reeves Contractors Inc.*, 701 So. 2d 774, 786 (Miss. 1997). Yates Engineering contends that its only

20

duty was to draw the plans and specifications of the scaffolding. However, the parties had no written contract that precisely limited Yates Engineering's duty in that manner. Without the benefit of a contract, it is necessary to examine the conduct of Yates Engineering in order to determine whether it owed a duty to the Plaintiffs. Yates Engineering drew the very plans for the scaffolding that collapsed, and it was their duty, without a contract specifying otherwise, to ensure that the design was being followed and that the scaffolding was reasonably safe.

¶47. Perry, the Yates Construction superintendent, requested Ted Pope, a Yates Engineering engineer, to draw plans and specifications for the construction of the scaffolding. In response, Pope visited the site where Yates Construction had already begun constructing the scaffolding. Pope observed the scaffolding, and testified that "there were some wall shores up and, I think, some columns were being formed. But other than that I can't recall." Deposition testimony reveals that Pope examined the partially constructed scaffolding, and discussed his proposed plan and ideas for the completion of the scaffolding with Mike Clark of Yates Construction, who was responsible for constructing the scaffolding. Specifically, Pope testified:

> Q:    . . . Did you know at some point prior to you sending out your drawings that Yates [Construction] employees were erecting shoring [/scaffolding] prior to receiving your drawings?
>
> A:    Did I know that Yates [Construction] was doing shoring[/scaffolding] before receiving my drawings?
>
> Q:    Right.
>
> A:    I didn't know for a fact that they were.

21

Q:     What did you know?

A:     I knew what I saw that day I came down here and talked to Mike.

Q:     Did you know what they were planning on doing in the following days?

A:     No.

Q:     Did you ever learn that they had erected shoring[/scaffolding] prior to receiving your drawings?

A:     No, I did not know.

Q:     Did it matter to you whether they erected shoring prior to receiving your drawings?

A:     Did it matter?

Q:     To you.

A:     Yeah.  Yes.

Q:     Okay.  What was your opinion on whether they should erect shoring[/scaffolding] prior to receiving your drawings?

A:     I just don't see how you can erect it without plans.

¶48.   According to Pope, he did not know whether Yates Construction had continued to build the scaffolding prior to receiving his drawings that Perry had requested.  Indeed, Pope confirmed that continuing building the scaffolding was essential, as he testified: "I just don't see how you can erect it without plans."  Pope testified that there were some details that Yates Construction needed to know that could only be gleaned from his plan drawings and not solely through his discussions on site.

¶49.   There is a genuine issue of material fact of whether the construction of the scaffolding was actually finished before Pope's final diagram was submitted.  The Plaintiffs' expert, Dr.

22

Sinno, opined in his report that the construction was probably finished by the time the final plans were submitted. The majority states that it is unclear how much of the scaffolding had been built when Yates Construction received Pope's drawings. I cannot say that there are no genuine issues of material fact when the evidence is not even clear on how much of the scaffolding had actually been constructed when Yates Construction received Pope's design drawings.

¶50. It is undisputed that the as-built scaffolding by Yates Construction did not match Yates Engineering's plans and specifications. The majority finds that there is no evidence that Pope's design caused the Plaintiffs' injuries because Yates Construction did not actually follow design drawings that it had commissioned from Pope. However, had Pope not submitted fundamentally flawed and impossible-to-follow design drawings, Yates Construction would not have been forced to ignore the deficient drawings and act on its own by constructing the scaffolding without the benefit of sufficient drawings. Accordingly, I would submit the issue of determining whether Yates Engineering caused the collapse to the fact-finder. *See Knox v. Mahalitc*, 105 So. 3d 327, 329 (¶7) (Miss. Ct. App. 2011).

¶51. A genuine issue of material fact exists relating to whether Pope's initial site visit constituted an inspection in compliance with the Yates Safety Manual. A genuine issue of material fact also exists regarding whether Pope conducted additional inspections of the scaffolding. Perry, the Yates Construction superintendent, testified that he saw Pope, the Yates Engineering engineer, at the construction-site office, a block away from the area where the collapse occurred about a week before the collapse. Perry assumed that Pope performed

23

an inspection of the scaffolding in accordance with the Yates Safety Manual, which requires the erected shoring to be inspected by an engineer qualified in structural design. However, Pope denies he ever went to the construction site or did not recall going there. The majority states that "when pressed further," Perry conceded his original answer on a previously submitted OSHA form that stated he thought Pop had inspected the scaffolding. It is for the jury to decide whether to believe the representations made by Perry on the OSHA form that he thought Pope performed an inspection or that Yates Construction did not have an engineer to inspect the scaffolding.

¶52.    I also would find that Pope undertook a duty to inspect the scaffolding even though Pope denied inspecting or did not recall inspecting the scaffolding before the collapse. *See Doe ex rel. Doe v. Wright Sec. Servs. Inc.*, 950 So. 2d 1076, 1080 (¶12) (Miss. Ct. App. 2007) ("A duty also exists where a party contracts or otherwise assumes a duty."). This undertaken duty is evidenced by the fact that Perry was under the impression, whether through the actions of Pope or their conversations, that Pope  was at the construction site inspecting the scaffolding a week before the collapse. Moreover, Pope did not unequivocally testify that he did not perform an inspection of the scaffolding. Pope simply testified that he did not recall performing an inspection. In sum, Yates Engineering undertook a duty through its conduct to ensure that the scaffolding was safe.

¶53.    "The moving party has the burden of demonstrating that no genuine issue of material facts exists, and the non-moving party must be given the benefit of the doubt concerning the existence of a material fact." *Duckworth v. Warren*, 10 So. 3d 433, 437 (¶9) (Miss. 2009).

24

Yates Engineering has failed to meet its burden. Because there are genuine issues of material fact that needed to be decided by the jury, I would find that summary judgment was improperly granted in favor of Yates Engineering.

## II. ARMC

¶54. The circuit court initially denied ARMC's motion for summary judgment in a well-reasoned opinion and order. According to the circuit court on its initial review of ARMC's motion for summary judgment, the key issue was whether an agency relationship had been established between ARMC and Yates Construction. Initially, the circuit court found that there was a genuine factual issue for the jury as to whether the acts and conduct of ARMC and Yates Construction was sufficient to create an agency relationship whereby ARMC could be held liable if it was proven that a safe working environment was not provided. Alternatively, the circuit court found that ARMC was not entitled to immunity as it is not the type of contractor or statutory employer contemplated under the Workers' Compensation Act and has not assumed responsibility under the Act.

¶55. When ARMC was the only defendant remaining in the case, the circuit court entered an order simply stating that it had reconsidered ARMC's motion for summary judgment and found it was well-taken. The order provided that the circuit court found no genuine issue of material fact remained with respect to the Plaintiffs' claims against ARMC, and it was entitled to a judgment as a matter of law. I disagree.

¶56. Mississippi Code Annotated section 11-1-66 (Rev. 2014), provides: "No owner, occupant, lessee or managing agent of property shall be liable for the death or injury of an

25

independent contractor or the independent contractor's employees resulting from dangers of which the contractor knew or reasonably should have known." "Likewise, Mississippi common law protects business owners from injuries sustained by independent contractors on the work site." *McSwain v. Sys. Entergy Resources Inc*. 97 So. 3d 102, 108 (¶19) (Miss. Ct. App. 2012). The exception to the rule is that "an employer is under a duty to provide an independent contractor with a reasonably safe working environment or give warning of danger." *Id.*

¶57. "While the general rule is that the owner of the premises does not have a duty to protect an independent contractor against risks arising from or intimately connected with the work, there is an exception where the owner maintains substantial de jure or de facto control over the work to be performed." *Coho Resources Inc. v. McCarthy*, 829 So. 2d 1, 13 (¶30) (Miss. 2002). "While the owner of a premises, under Mississippi law, generally has a duty to use reasonable care to keep its premises in a reasonably safe condition for business invitees, the owner is not an insurer of the invitee's safety." *Id.* at 10 (¶20). "What is critical is whether the project owner maintains any right of control over the performance of that aspect of the work that has given rise to the injury." *Magee v. Transcon. Gas Pipe Line Corp*., 551 So. 2d 182, 186 (Miss. 1989). "In this setting the undisputed language of the contract becomes important." *Id.* With no formal written contract between ARMC and Yates Construction, the conduct of the parties must be examined.

¶58. ARMC possessed the ultimate right and ability to control all work on its premises, including stoppages of any aspect of the construction for safety reasons or otherwise. The

26

majority confirms that only ARMC had the authority to stop work on this project. The only limitations on ARMC was that its ability to inspect the nature, quality, and safety of the work was an "unwritten requirement" or "understanding" that ARMC would obtain permission before entering the work zone for safety reasons. Farr, the vice president of operations at ARMC, gave the following deposition testimony:

> Q: If at any point during the work on this project, if the hospital had wanted to cease construction efforts, could it have done so?
>
> A: Sure.
>
> Q: Whether it be for financial or any other reason. There's nothing that you're aware of on behalf of the hospital that would have prevented them from ceasing further construction efforts on this project?
>
> A: Not that I know of.
>
> . . . .
>
> Q: If at any point in time the hospital was unsatisfied with the work that had been done, could the hospital have ordered the work to have been redone? In other words, to do it over again?
>
> A: Yeah. If, for some reason - - if, for some reason, it wasn't meeting our expectations.

¶59. I would not find that complying with this "unwritten requirement" or "understanding" to perhaps put on a hard hat equates to a complete surrender of the premises to Yates Construction. Moreover, Yates Construction occupied actual office space in ARMC during the construction project. ARMC's right to control the progress of the construction work on its premises is also evidenced by the fact that there was documentation setting a timeline for completion of the project. ARMC argues that it is not in the construction business; however,

Farr testified that the VPs have various duties, including clinical and nonclinical duties. Additionally, an ARMC representative was present and participated at the monthly construction progress meetings. Yates Construction would regularly call or contact Farr outside of the regularly scheduled progress meetings because Yates Construction had certain matters to address regarding the construction project, for which they needed Farr's input.

¶60. An agency relationship may be shown by circumstantial evidence. *Powell v. Masonite Corp.*, 214 So. 2d 469, 470 (Miss. 1968) (citing *Hobbs v. Int'l Paper Co.*, 203 So. 2d 488 (Miss. 1967)). The long continued employment of a person or entity that may be terminable at will is a strong indicator that the entity is not an independent contractor, but has assumed the status of an employee. *Id.* Regardless of the classification of Yates Construction and whether it assumed the status of an employee, both an independent contractor and a servant may be agents of their principal. *See Richardson v. APAC - Miss.*, 631 So. 2d 143, 147-48 (Miss. 1994).

¶61. I would also find that a genuine issue of material fact exists in determining whether an agency relationship existed between ARMC and Yates Construction. Consistent with the normal course of business for a significant amount of time, no contract existed between ARMC and Yates Construction pertaining to this construction project. Farr testified that Yates Construction has maintained a physical presence on ARMC's campus for more than twenty years.

¶62. Alternatively, ARMC argues that it should enjoy the protections of a "statutory employer" under the Mississippi Workers' Compensation Act. I disagree. ARMC is not the

28

type of contractor or statutory employer as contemplated by the Mississippi Workers' Compensation Act. *See Richmond v. Benchmark Const. Corp.*, 692 So. 2d 60, 63 (Miss. 1997) (finding where defendant property owners had no responsibility under the Workers' Compensation Act, they enjoy none of the benefits of the Act).

### III. Foil Wyatt

¶63. The circuit court stated in its opinion granting summary judgment in favor of Foil Wyatt that an architect may be held liable for workplace injuries only if it assumes by contract or conduct the responsibilities of the supervision of construction and maintenance of safe conditions on the construction project. *See Jones*, 701 So. 2d at 785-86. I cannot be certain that Foil Wyatt did not exhibit any conduct that would make it appear that it had assumed any duties because this case is factually sensitive. Also, the record is not clear as to whether the dismissal of the opinion of the expert, Dr. Sinno, was relevant in determining whether Foil Wyatt assumed responsibility by its conduct. I agree that Foil Wyatt is protected by its contract, but I am not willing to assume the role of the jury and dissolve the issue of whether Foil Wyatt exhibited any conduct that made it appear that it had assumed responsibility. This case is factually sensitive, and these facts should be decided by a jury.

¶64. In *Jones*, the court stated:

> We philosophically disagree with the holdings of *Hanna* and *Walker* to the extent that they hold that a contractual duty to maintain actual supervision over the details of the construction project does not entail the duty to supervise safety. It would seem natural that the supervision of safety is encompassed in the duty to supervise, and no separate agreement to supervise safety is necessary where the architect is supervising the details of every other aspect of the project.

29

*Id.* at 785. In *Hobson*, 878 So. 2d 68, 73 (¶18) (Miss. Ct. App. 2003), this Court interpreted this language in Jones "to mean that if the engineer has contracted to supervise every other aspect of the project besides safety, then liability, with regard to safety, may then be extended to the engineer in some circumstances, regardless of contractual obligations[.]" The court also adopted the aforementioned *Hanna* factors identified in the majority opinion.

¶65. I would find Foil Wyatt's conduct was sufficient to establish a duty, thereby precluding summary judgment. Foil Wyatt was a regular visitor to the construction site and a participant in the onsite project meetings between the contractor, various subcontractors, and the owner. Skip Wyatt testified that he was on the job site once a week, and after the monthly progress meetings, he would walk around the construction site in order to note how much work had been completed so that he could certify payments to Yates Construction. Foil Wyatt provided specifications for the formwork and rebar. Moreover, Foil Wyatt was at liberty to reject work that did not conform to the contract documents. For example, Foil Wyatt could request that a concrete slab be redone if it was uneven or did not conform with specifications.

¶66. I agree with the Plaintiffs' argument that any inspections of the formwork conducted by Foil Wyatt to ensure that the concrete would be true when poured would necessarily included an observation and inspection of the underlying supporting scaffolding. Testimony reveals that the subject scaffolding was inadequate to the most casual observer. Telly Walsworth, the owner of Spectrum II who employed the Plaintiffs, gave the following testimony:

Q: All right. Did it appear that the shoring[/scaffolding] had been constructed safe and did it look stable to you?

A: It looked kind of homemade. I've never seen nothing like it before.

Q: Okay. Did you tell anybody at Yates Construction about it?

A: Yes. I told Mr. Clark, who was the superintendent. I told him that it didn't look safe and I didn't feel like it would work. He said, "Well, we've been doing this 30-something years. Get up there. It's going to be fine."

¶67. Clearly, Walsworth was concerned about the appearance of the scaffolding, which would support the eventual concrete pour. Wyatt and Perry, of Yates Construction, inspected the formwork to ensure that wet concrete would not leak out of it. Wyatt could not recall if the scaffolding was finished at the time of the inspection, but he confirmed he did not inspect it. If the scaffolding was completed at the time of the inspection of the formwork, Wyatt should have been alerted to the scaffolding, which Walsworth described as "homemade." Nonetheless, Wyatt inspected the rebar approximately a week before the collapse. Had the scaffolding not been completed at the time of the inspection, Wyatt should have noticed the "homemade" appearing scaffolding during one of his walks through the construction site.

¶68. It would seem natural that the design and inspection of the formwork extended to the scaffolding that supported the formwork. Certainly, it was not part of the plans and specifications for the formwork to collapse and have to be rebuilt. I cannot say that the duty to inspect the formwork and ensure compliance with the formwork plans and specifications did not also impose a duty to inspect the scaffolding, which supported the formwork. Foil Wyatt was contractually obligated to visit the site to become generally familiar with the

31

progress and quality of the work and endeavor to guard ARMC against defects and deficiencies in the construction. I would find that Foil Wyatt assumed a duty by its conduct to provide a safe working environment. A genuine issue of material fact exists in determining whether that duty was breached. Accordingly, I would reverse the summary judgment that was entered in favor of Foil Wyatt.

IV. **Whether the circuit court erred by dismissing Medina's claim based on his alleged illegal-alien status in favor of Yates Engineering and ARMC.**

¶69. One of the Plaintiffs, Medina, invoked the Fifth Amendment and repeatedly declined to verify his citizenship and work status during his deposition testimony. The circuit court surmised that he was an illegal alien and concluded that but for his illegal employment, Medina would not have been injured during the construction accident during the course of his employment. The circuit court dismissed Medina's case, without prejudice to his recovery of statutory workers' compensation benefits, under the wrongful-conduct rule, which provides that "no court will lend its aid to a party who founds his cause of action upon an immoral or illegal act." *Price v. Purdue Harma Co.*, 920 So. 2d 479, 484 (¶13) (Miss. 2006).

¶70. The circuit court reached its decision relying on *Price*. However, in *Price*, the court also stated: "At the same time, if the plaintiff is a lawbreaker at the time of his injury, that alone is not enough to bar the plaintiff from recovery." *Id*. at 485 (¶14). "The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of the case." *Id*. In *Price*, the plaintiff was refused compensation for his personal-injury claim against pharmaceutical entities due to his abuse of OxyContin, which caused him the

32

very harm for which he was seeking compensation. *Id.*

¶71.    Medina contends that there has been no finding of a causal connection between Medina's alleged illegal-immigrant status and his injuries. I agree. Medina's alleged illegal-immigrant status alone is not enough to bar him from recovery. Although the circuit court found cause in fact, unlike the plaintiff in *Price*, Medina's alleged illegal conduct was not an integral and essential part of his case such as to prevent his recovery under the wrongful-conduct rule.

¶72.    The circuit court also noted that allowing Medina to recover for injuries sustained during the course of his own illegal conduct would be contrary to public policy. However, undocumented-immigrant plaintiffs have been allowed to seek recovery for personal injuries suffered in the workers' compensation context, specifically under the Longshore and Harbor Workers Compensation Act. *See Bollinger Shipyards Inc. v. Director, Office of Worker's Compensation Programs*, 604 F.3d 864, 873 (5th Cir. 2010) (holding that undocumented immigrants are eligible to recover workers' compensation benefits under the LHWCA). Similarly, Medina's alleged illegal-immigrant status, standing alone, does not prevent him from pursuing a personal-injury claim. *See Moreau v. Oppenheim*, 663 F.2d 1300, 1307-08 (5th Cir. 1981) ("Even assuming that violations of the immigration laws by the [plaintiffs] occurred, the remedy for these violations is . . . criminal sanctions, not denial of access to court.").

> **V.    Whether the circuit court erred by denying Yates Engineering's motion to dismiss Robertson.**

¶73.    Yates Engineering cross-appeals claiming that the circuit court erred by denying its

33

motion for summary judgment against one of the Plaintiffs, Robertson, under the theory of judicial estoppel for failing to disclose his personal-injury cause of action. I disagree.

¶74. On December 23, 2007, before the collapse, Robertson and his wife, LaDonna Robertson, filed for Chapter 13 bankruptcy. The bankruptcy court confirmed the plan on March 25, 2008, and Robertson and his wife began making payments under the plan. The collapse occurred on November 17, 2008. Following the collapse, Robertson and his wife defaulted on their payments, and the bankruptcy trustee filed an action to dismiss or remedy the default on March 12, 2009. On June 6, 2010, Robertson's bankruptcy case was dismissed for a default in payments. No discharge or other relief was granted to the Robertsons. On September 1, 2010, Robertson filed his complaint in this personal-injury case.

¶75. Robertson's personal-injury claim arose after he filed his bankruptcy petition and after his Chapter 13 plan was approved by the bankruptcy court. Similarly, in *Copiah County v. Oliver*, 51 So. 3d 205, 207 (¶8) (Miss. 2011), Oliver's personal-injury cause of action arose after she had filed her bankruptcy petition and after her Chapter 13 repayment plan was approved by the bankruptcy court. *Id.* The circuit court in *Oliver* issued a stay and referred the matter to the bankruptcy court for an assessment of the application of judicial estoppel. *Id.* at (¶11)*.* When the matter was referred to the bankruptcy court, Oliver was making payments under an active bankruptcy plan. *Id.* at 206 (¶4). However, unlike Oliver, Robertson's bankruptcy case had been dismissed for failure to make payments, and no discharge had been granted at the time Yates Engineering raised the issue of judicial estoppel.

34

¶76. The circuit court found that it could not refer the case back to Robertson's non-existent bankruptcy proceeding as the circuit court did in *Oliver*. The circuit court correctly concluded that because Robertson's bankruptcy case had been dismissed and no discharge had been granted, judicial estoppel is not applicable. Robert's failure to disclose his personal injury case was of no consequence. Robertson received no benefit for his failure to disclose his personal-injury claim. Finding no error, I would affirm the circuit court's denial of Yates Engineering's motion to dismiss Robertson's case based on judicial estoppel.

**VI. Whether the circuit court erred by denying ARMC's motion to dismiss based on the statute of limitations.**

¶77. ARMC claims the circuit court erred by denying its Rule 12(b)(6) motion to dismiss because the Plaintiffs' claims against it are barred by the three-year statute of limitations. I disagree. I would find that the Plaintiffs' claims against ARMC were not barred by the statute of limitations.

¶78. The collapse occurred on November 17, 2008, and it is undisputed that the applicable statute of limitations is three years. On January 26, 2011, the court held a hearing on Yates Construction's motion to stay the proceedings. On February 11, 2011, the circuit court entered an order staying the proceedings pending the resolution of the declaratory-judgment action in the United States District Court for the Southern District of Mississippi. The circuit court's order provided that the statute of limitations was "hereby tolled from January 26, 2011[,] until this Court lifts the subject stay pursuant to Mississippi Code Annotated section 15-1-57 (Rev. 2012)." The circuit court ordered that "the parties shall obtain a hearing date before [the circuit court] where the Plaintiffs will be allowed to apply to the Court to lift the

35

stay." The circuit court also ordered that "[t]he tolling of the statute of limitations during this time shall continue until [the circuit court] lifts the stay and allows Plaintiff to prosecute their actions herein." On September 6, 2011, the circuit court lifted the stay. Mississippi Code Annotated section 15-1-57 provides:

> Where any person shall be prohibited by law, or restrained or enjoined by order, decree, or process of any court in this state from commencing or prosecuting any action or remedy, the time during which such person shall be so prohibited, enjoined or restrained, shall not be computed as any part of the period of time limited by this chapter from the commencement of such action.

¶79.     Thus, the statute of limitations was tolled from January 26, 2011, until September 16, 2011, because the Plaintiffs' ability to prosecute their claims was restrained. Under section 15-1-57, the 233 days that the proceedings were stayed cannot be computed as part of the running of the statute of limitations. Therefore, the Plaintiffs' second amended complaint adding ARMC on June 8, 2012, was not time-barred. Moreover, ARMC was actively involved in this litigation as evidenced by its participation in the hearings contained in the record before it was added as a defendant. Finding no error, I would affirm the circuit court's denial of ARMC's motion to dismiss.

¶80.     For the reasons stated in my dissent, I would reverse the summary judgment granted in favor of Yates Engineering, ARMC, and Foil Wyatt. I would also reverse the summary judgment granted against Medina. I would affirm the circuit court's denial of the motion to dismiss against Robertson. I would also affirm the circuit court's denial of ARMC's motion to dismiss. Accordingly, I would remand this case for a trial on the merits.